Brokerage, and we'll hear from Ms. Hill. May it please the Court. Your Honors, this Court has stated that the investor who seeks to blame her investment loss on fraud or misrepresentation must exercise reasonable due diligence to become aware of the nature of the investment and associated risks. It is undisputed in this case that neither Mr. nor Ms. Rowten conducted any investigation whatsoever prior to investing their life savings in the REIT. And this Court has repeatedly held to the well-settled principle that this is an affirmative duty. In fact, in Bodenhamer v. Shearson-Lehmann-Hutton, an opinion authored by Judge Jones, a potential plaintiff has an affirmative duty to diligently investigate facts which might lead to discovery of the fraudulent conduct. And as this Court noted in Martinez-Tapia v. Chase Manhattan Bank in 1998, a case that is very similar to this factually, a plaintiff has to do more than simply rely on the bald assertions and promises of advisors. Before investing life savings or any amount of money, reasonable diligence requires her to read the only documents that exist governing the nature of the investment. Why do you think Judge Cummings, although given at least three opportunities to consider this statute of limitations defense, didn't accept it? Your Honor, we believe in what we take issue with in Judge Cummings' decision arose at the summary judgment stage. And it was there that Judge Cummings determined that the fact question of whether the Rowtens received or did not receive the prospectus was dispositive as to whether the statutory period began to run at that time. But that is entirely contradictory to this case, to this Court's history of cases. Well, I was just, it led us to wonder whether your client had cited the right cases to him. Well, Your Honor, we certainly cited Bodenhamer, which Judge Jones authored. And in that case, this Court made very clear that there is an affirmative duty and that the investor must seek out the correct documents and must seek out the readings. And certainly, this Court did decide in Martinez-Tapia and as noted by the United States Supreme Court in Merck that an investor must respond to storm warnings. And here— Was there any jury issue about the fact whether they got the prospectus or not? Your Honor, no. There was not specifically a question as to whether the prospectus was received. There was a question as to whether they knew or should have known prior to April 30th of 2009 because this case was filed over four years and seven months after. What did they sign for? Your Honor, in this case, Ms. Rowton signed the subscription agreement on September 18th, 2008. Within the subscription agreement, there are a total of 11 references to the prospectus. Now, importantly, some of those references actually did mention risk, and that flies in the face of any guaranteed investment. In fact, the very idea of a guaranteed investment is a red flag itself. As Mr. Rowton testified at trial, he knew that there was no such thing as a guaranteed investment. He testified, maybe a CD, but I know of no other. I was startled in the closing argument. It was a short closing argument, but your points were perhaps a value will still go up, and then it was would it be reasonable that anybody would sign a guaranteed agreement, but I didn't see any reference in the closing to impeachment use of the prospectus. Well, Your Honor, we certainly rose that issue. I know it came up factually, but I was startled. I guess it relates to just questions about it may not be preservation, but at the summary judgment stage, what cases were given, and to reformulate that as a question, the district judge relied on the Nashua partnership case. Could you distinguish that? Well, Your Honor, here it is true that the investors were not . . . it was a fact issue whether the prospectus was obtained or not, but even so, the subscription agreement provided glaring inconsistencies, that there was more information that needed to be had, that the investors truly did need to seek further beyond the subscription agreement. Do Martinez or Bodenheimer or any of the cases about storm warnings and duty to inquire, do any of them involve a case where there's testimony that it was unavailable or not given at all? Well, in Martinez-Tapia, it in fact was not only not given, but there was no reference to it in the discussions whatsoever. In fact, in Martinez-Tapia, the plaintiff did not even sign a subscription agreement, and this court held that the plaintiff was charged with notice of, in that case, it was an offering circular because the plaintiff had read a brochure, and the brochure referenced the offering circular. Here, very similarly, the subscription agreement referenced the prospectus on at least 11 occasions. In fact, it required Ms. Roten to warrant and represent that not only had she read and received the prospectus, but she had done so five days prior to the subscription agreement. Now, that is a storm warning, and as Judge Jones has characterized, dyes the flag red, that there is incredibly important information in that prospectus. And in fact, if we look at the very first page of the prospectus, it warns the investor that this is a high-risk investment and that the investor should not invest any money in this unless the investor is prepared for a, quote, total loss. And then on that very first page, it goes on to cite several various risks that are more fully explained later on. You're describing the subscription agreement? No. This is the prospectus. Prospectus, okay. And Ms. Roten testified at trial that had they read the prospectus, that they never would have invested their money. Wasn't the prospectus available online, I'm just wondering? Or is that in evidence? That was not in evidence, Your Honor, but we do know that Ms. Roten said that she did sign the subscription agreement and that she, quote, read part of it. And Mr. Roten acknowledged that as a mortgage broker, as he is, that a party who signs an agreement is held to have read that agreement and been aware of the warnings. Is due diligence a fact-specific determination or is it objective? Does the standard of due diligence differ depending on the sophistication of the investor? Absolutely not, Your Honor. It is an objective analysis. And, in fact, that is exactly what the Rotens attempted to do here is excuse their behavior because they, quote, trusted the stockbroker. And that is where she told me to sign, as Ms. Roten testified at trial. And that's important because other investors in the past, such as in Jensen v. Snellings, attempted to rely on their own lack of sophistication to avoid the running of the statutory period. And as this court stated, one must exercise reasonable due diligence in order to avail oneself to the tolling of the statutory period. Here there is no dispute that regardless of the prospectus or not, there was no investigation whatsoever. And, in fact, Ms. Roten's testimony as to the eventual investigation that she conducted in June or July of 2010 reveals just how quickly she could have learned of her claims. Specifically, Ms. Roten picked up the phone and called Barringer Harvard REIT. And after one phone call, Ms. Roten was aware that the REIT was not a guaranteed investment. She then went on to testify that she did some Internet research and quickly learned that it was, quote, a bad investment. But most importantly, Ms. Roten and Mr. Roten did none of this at the time that they entered the investment. In fact, Ms. Roten testified that at the time she signed the subscription agreement, she had not yet paid into the investment. And at that moment, she had a chance to demand that she either receive a prospectus or call the REIT to find out more information. In fact, on page 5251 of the record, the Rotens testified that they had previously lost money in an investment. And so if they are going to try to rely on their own subjective knowledge, we have the fact that they previously lost money in an investment and that Mr. Roten worked in a bank's mortgage department. He testified that he was well aware that the real estate market fluctuated. This was an REIT investing in business properties, so it was going to be generating income because of the rents. Is that fair to infer? That is fair, Your Honor. And there was some indication that due to the market crash that there was a decrease in value. They entered this in, what, 2008? They invested on September 18, 2008. So the market was in disarray, to put it mildly at that point. Absolutely, Your Honor. In fact, at the beginning of 2008, the United States Association of Realtors had already reported the greatest loss that they had seen in over 25 years. And so while subjective knowledge is not what we base our analysis on, Mr. Roten was in the mortgage business. He understood real estate at least to the extent that he understood that it could fluctuate. When did they receive the monthly statement that reflected a decline, a sharp decline? We believe it was in June of 2010, Your Honor. And that is the time that the court held that the statutory period began to run. But that is contradictory to this court's decisions in prior cases, such as Bodenhammer and such as Martinez-Tapia, and certainly in Jensen v. Snellings, although that was different facts, this court repeatedly discussed that storm warnings and red flags cannot be ignored. The storm warnings that were— Is there any notion that the claims that they made, that the contractual violation that the jury found, could only have accrued once they realized there was a loss in value? Well, Your Honor, interestingly, while Caprock Securities was not included in the jury question for breach of contract, Texas courts have never held that a breach of contract can be told, even though that particular cause went to the jury. But there is no evidence that the Rotins conducted any investigation whatsoever at the time that they entered the subscription agreement. Which is when the contractual violation occurred? Yes, Your Honor. Interestingly, the contractual allegation was that the stockbrokers provided the guarantee to the Rotins, and therefore the Rotins accepted that offer and placed their— The real contracted issue, then, is an oral one that was made simultaneously of signing the agreement? Yes, Your Honor, that is correct. Because the Rotins sued the stockbrokers and the broker-dealer, Caprock Securities, rather than Berenger Harvard-Reid. There was another case in the Northern District of Texas that had already been dismissed for a suit against Berenger Harvard-Reid itself. But here, importantly, the very statement that there were no, as Ms. Rotin described them, kits available was a red flag. As this Court has stated, a reasonable investor must inquire further when facts such as that are raised. And that has always been our argument, that not only was there an affirmative duty prior to entering the investment, that once there are red flags, there is an additional duty under inquiry notice that then you are to investigate. And the United States Supreme Court made this clear in Merck v. Reynolds just a few years ago when it noted that inquiry notice triggers the time that the investor must begin an investigation. And then the statutory period is triggered once that investigation would have revealed actual notice to an objective investor. Here, because of Ms. Rotin's own testimony, we know that regardless of the prospectus being received or not, she picked up the phone and called Berenger Harvard-Reid. And at that moment, she immediately knew that her investment was not guaranteed. And importantly, this is a very simple fact about a nature of an investment, as opposed to Martinez-Tapia, where the complaint was that he did not know that he could not redeem his shares and had to look in the offering circular to see that that right was given to the managers. Here, it's just as simple, is this investment guaranteed or not? What's the risk language in the agreement itself that you think is the most sort of forward prodding, you better look? Your Honor, on the second page of the subscription agreement, about midway down, the subscription agreement states, see investment by tax-exempt entities and ERISA considerations in the fund's prospectus as supplemented to date, in parentheses, the prospectus, for discussion of risks related to an investment in shares by certain tax-exempt or tax-deferred plans. Now, that comes as an asterisk next to the custodial registration, which is where this particular investment fits. Well, she also signed it, notwithstanding that under penalty of perjury, she was required to confirm that she had had the prospectus five days in advance. Yes, Your Honor, we felt that that was an important fact issue, but regardless of whether she'd had the prospectus or not. Well, I'm just thinking that's a red flag also. Absolutely it is, Judge Jones, and that is part of what we pointed out at summary judgment and the Rule 50 motion to the court, regardless of which cases were cited at that time. That was a red flag, as was the fact that the kits were sold out because it was selling, quote, so well. It's for these reasons we ask this court to reverse and render judgment. Thank you. All righty, Mr. Bustos. May it please the Court. Because under the Supreme Court's Merck opinion, no reasonable investor would have discovered appellant's fraud until they had lost more than half their savings over a year later, the Roten's lawsuit was timely filed. And because the record is replete with evidence that the Caprock brokerage firm controlled the fraudulent advertising and its brokers, the trial court properly entered judgment against Caprock as well. Where did the 7% representation come from? Did that come from the ad or from Goldson and the other fellow? Both, Your Honor. The lady, right. Both, Your Honor. The 7% guaranteed rate of return on the investment representation came from the written advertisements, more than one written advertisement published in the Lubbock Magazine, and it was reiterated in face-to-face meetings with these two brokers. In the written ad, does it say guaranteed or does it say if you aren't getting as much as 7% elsewhere, might want to look to us? It says 7% without any qualifying language. Does it say guaranteed? I don't believe it says that. I'll have to take a look at the record again, Your Honor. I can do a supplemental brief. No, that's right. But it doesn't have any qualifying language like, well, your investment may go in down in value. It doesn't say anything. So it was an unqualified offer of a 7% rate of return, and Appellant Robinson admitted at trial that the ads promised a 7% rate of return and that she told the Rotins that the investment would be safer than mutual funds or stocks. There was evidence admitted in the trial that the Rotins did not receive a prospectus, and that was buttressed by independent fact witness testimony from another potential investor. Well, then I still don't understand how you distinguish this case from Martinez-Tapia or from that nationwide. In Tapia, we had a highly sophisticated investor. He was a former state finance secretary. These people aren't stupid. I mean, to be in the mortgage brokerage business, I mean, how can you not know about the risks of mortgage lending? Mr. Rotin had a high school education and nothing beyond that. Well, was he just a closing specialist? Yes, Your Honor. You're saying he didn't do anything except closings? He filled out paperwork. The record shows that he filled out paperwork to help people get— Well, you can't be stupid and fill out the hundreds of pages of paperwork that are required for every mortgage. Surely the bank, whoever, the title company or whoever employed him sent him to school to learn what those documents were about. Is there nothing in the record about any of that? It talks about generally what he does to help people close mortgages and fill out paperwork. But going back to the Tapia case that you raised, Judge Jones, that case is distinguishable because in that case the court's opinion know that Mr. Tapia never requested a prospectus. He never read it. In essence, it was never discussed. In this case, it was withheld from the plaintiffs. They said there's a prospectus, but you can't have it because we don't have any anymore. But she signed under penalty of perjury. Now, that's probably a false threat, but wouldn't that raise reasonable suspicion to anybody? She was told where to sign and what to sign by her broker. What more could the REIT have done to—you think it should have had an ad like the drug companies that said 7 percent as long as you're a sophisticated investor and you realize this and you don't have a big mortgage and you're not investing all your life, like the drug ads where they have about 85 qualifiers? Just the subscription agreement alone seems to suggest over and over again that you have to be qualified financially to invest in it. It keeps referring back to the prospectus. It's trying not to make representations so that it won't make half-truth representations, and then you sign under penalty of perjury. It seems to me it's going to great lengths. To protect investors. The subscription agreement that they did sign mentioned the word risk once. Ms. Hill pointed to the only one place in that subscription agreement that references the word risk. When you go out and buy stocks from your stockbroker, unless it's a large amount, you don't ordinarily have to—they do make you fill out a form about your suitability, but if you just want to buy 10 shares of AT&T, they're not going to have you fill out a form that says I'm a suitable investor, my net worth is X. Your Honor, the Rowans had no experience buying individual stocks and bonds. That's in the record. So they didn't have that base of knowledge to draw from in making this investment. And it's not the REIT company that was actually doing the REIT fault here. It's the brokers. In responsible investment advertising, whenever you have an investment advertised, it always says there is a prospectus and read it before you invest. These ads—and the court can see them. There's a series of five ads. Nowhere in those advertisements does it say read this prospectus for risk discussion. It just says 7% rate of return. Go ahead. I guess what's your best case that when a party makes the contractual representation that they have read it, that our court will overlook that contractual representation? I'm not sure I completely understand the question. If you could rephrase it. Well, here with the penalty perjury and the repeated references to it, it would seem like your clients made a contractual representation that they'd read it. And I'm wondering, is there any case that says, well, the facts can contradict their own signature that they had? What case do you have that allows courts to overlook that? In the Jensen v. Snelling's case from this court— Jensen? Yes, Your Honor. In the Jensen v. Snelling's case from this court in 1988, this court found that concealment of facts to an investor is a fact to consider in determining when the statute runs. But here your client said that by signing, they were representing they had seen it. It's the opposite of concealment. She just testified that she signed where her broker told her to sign, and that— But what case allows that to undo the representation? That's what I'm asking for. Your Honor, I don't have a case before me right now. I'd be happy to— No, no. That's sort of where I'd gotten to as well. So the cases that appellants cite are factually inapposite. In almost all of them, the investors actually received the prospectus itself that had detailed and multiple warnings of risk. And so for that matter, because of that fact, several of their cases are inapposite. The Bodenhammer case is inapposite because the plaintiffs there actually received a prospectus that warned of high risk in the investment. Here the plaintiffs did not receive the prospectus at all. So that case is inapposite. What is it that you propose, what step or fact or occurrence starts the running of the four-year statute? When they knew of injury, Judge Wiener, and the Supreme Court in the Merck case had the two-part test that they formulated, and they said when a plaintiff either has actual knowledge of facts forming the basis for a cause of action or when a hypothetical reasonably diligent plaintiff would have discovered those facts, that's when the statute begins to run. Reasonably diligent doesn't mean when you sign that you've gotten something and you haven't that you are reasonably diligent even though you don't ask for or look for a copy. Your Honor, scienter is also something that needs to be considered when applying the Merck test. This court in McKeown v. United States held that facts relevant to the existence of an injury are something to look at also when applying the discovery rule to the statute of limitations here. In the Merck case, the Supreme Court held that, quote, an incorrect prediction about a firm's future earnings by itself does not automatically tell us whether the speaker deliberately lied and therefore does not constitute knowledge of facts regarding the element of scienter in considering limitations in a securities fraud action. That's at page 650 from the Merck opinion. So the rotunds cannot be held responsible for the contents of the prospectus because they never received a prospectus as they were told that none was available to them. . 5 . Again. . . . . . . . . . . . . . . . . . . hurtable. . . . . . .  . . . . . . . . . . . . . mentees. .   . . . . . . . Green ellow Green E hurt Blue Thank you.